IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
Orlando Division

| | |
|---|---|
| OXIUM LLC, | ) |
| | ) |
| Plaintiff, | ) Case No. |
| | ) |
| v. | ) COMPLAINT FOR DAMAGES AND |
| | ) DECLARATORY RELIEF |
| OXO H20 SOLUTIONS, INC., and | ) |
| OXO H20 SOLUTIONS, INC., | ) DEMAND FOR JURY TRIAL |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT

Plaintiff Oxium, LLC ("Oxium"), brings this Complaint against Defendants oXo H20 Solutions, Inc. ("OXO"), and oXo H20 Solutions, Inc. ("OXO Barbados"), and alleges as follows:

## INTRODUCTION

1. This is a shocking case in which a Canadian outfit, acting through its desperate CEO, sought to carry off a daring – if farcically fraudulent – ruse to lie to and trick a local Florida company into a highly-lucrative exclusive worldwide distribution arrangement for its proprietary water-based technology products and systems

2. Oxium is a homegrown Florida-based business that manufactures a variety of water-based technology products and systems, including concrete restoration systems, fire protection systems, industrial cleaning solutions, and swimming pool finishing products.

3. Among other products and systems, Oxium has developed its acclaimed Microsys™ product and system, which operates as a penetrating concrete restoration system that strengthens and extends the life of concrete structures.

1

4. Recognizing the substantial value of Oxium's products, OXO, a Canadian company that holds itself out as offering concrete restoration services, approached Oxium about entering an exclusive worldwide distribution arrangement for its Microsys™ product and system.  In reality, as Oxium has since learned, OXO has no experience or expertise in the concrete business – it merely saw an opportunity and moved to seize it by any means necessary, including through false representations and other fraudulent conduct.

5. During the parties' negotiations, OXO represented to Oxium that it had secured client contracts and projects and would receive substantial government grants to support its distribution efforts.

6. OXO further represented that multiple outside investors also were waiting in the wings to invest in the parties' distribution efforts, subject to the parties entering an exclusive distribution agreement.

7. Relying on these representations, and facing constant pressure from OXO to get a deal done lest the company lose contracts and investments, Oxium agreed to enter what it thought was an exclusive worldwide distribution agreement for its proprietary Microsys™ product and system as well as a non-exclusive agreement for other, identified Oxium products.

8. Under that purported agreement, OXO obtained the exclusive distribution rights to the Microsys™ product and system in exchange for paying Oxium to manufacture its product and system.

9. While Oxium signed what it understood to be the parties' agreement, however, Oxium has since learned that OXO never signed that agreement.

10. Instead, long after Oxium thought the parties had entered an agreement, Oxium has learned that OXO actually rejected that agreement, and surreptitiously counter-proposed a different agreement, with substantially different material terms.

11. Among other things, in OXO's counter-proposal, OXO unilaterally and without notice of any negotiation expanded the scope of its exclusive distribution rights to include other current and even *future* Oxium products, as well as limited Oxium's termination rights. Long after Oxium thought the parties had a deal, OXO silently transmitted its different agreement to Oxium as if its counter-proposal were the parties' actual agreement.

12. Oxium has also recently learned that all of OXO's representations and promises made during negotiations on the agreement that it thought the parties had entered were false. OXO did not have a single customer contract or grants nor any substantial investor contributions.

13. After having made false representations to induce Oxium to enter an exclusive distribution agreement, and trying to trick Oxium into accepting a different agreement, OXO then wrongly demanded Oxium to comply with the terms of an undisclosed agreement that it never entered. Indeed, OXO's deception and mischief only came to light when OXO claimed that Oxium had breached terms of its different agreement that Oxium never agreed to or executed.

14. OXO's fraud has caused Oxium to suffer substantial damages. Oxium incurred costs and expenses to manufacture its Microsys™ product and system to meet OXO's alleged customer and contract demands. And believing it had entered a mutually agreed-upon distribution agreement, Oxium declined to pursue other lucrative distribution arrangements with other parties.

15. Oxium now seeks damages and declaratory relief from this Court to address the harms it has suffered as a result of OXO's wrongful conduct and declare the parties have no distribution agreement.

## PARTIES

16. Plaintiff Oxium is a leading researcher, developer, and manufacturer of water-based technologies, including fire protection systems, industrial cleaning solutions, and its proprietary Microsys™ Concrete Restoration product and system.

17. Oxium is a limited liability company formed under the laws of the State of Florida and has its principal place of business at 7320 Narcoossee Rd., Orlando, Florida 32822.

18. Defendant OXO holds itself out as a distributor of concrete protection and rehabilitation systems. OXO is a Canadian company with its principal place of business at 3900 350 7th Ave SW Calgary, Alberta T2R 0Y9, Canada.

19. Defendant OXO Barbados is a Barbadian company with its principal place of business at The Grove, 21 Pine Road, Belleville, St. Michael BB11113, Barbados, and has a mailing address of 3900 350 7th Ave SW Calgary, Alberta T2R 0Y9, Canada. On information and belief, OXO Barbados is a holding company, of which OXO is a subsidiary. OXO and OXO Barbados share the same directors and shareholders.

## JURISDICTION AND VENUE

20. The Court has diversity jurisdiction over this action pursuant to 28 U.S.C § 1332 because there is complete diversity between the parties.

21. For purposes of diversity jurisdiction, a limited liability company is a citizen of any state of which a member of the company is a citizen. *See Flintlock Constr. Servs. v. Well-Come Holdings*, 710 F.3d 1221, 1224 (11th Cir. 2013).

22. Oxium is a citizen of Florida and California because all of its members are citizens of Florida and California.

23. OXO is a citizen of Canada because it is incorporated and has its principal place of business there.

24. OXO Barbados is a citizen of Barbados because it is incorporated and has its principal place of business there.

25. The parties are therefore diverse for purposes of establishing subject matter jurisdiction. *See* 28 U.S.C. § 1332(a)(3).

26. The amount in controversy also far exceeds the sum or value of $75,000. *See id.* § 1332(a).

27. The exclusive distribution rights that OXO claims are highly valuable given the unique nature of Oxium's technologies, systems, and products. The value of those rights far exceeds $75,000. As a result of OXO's fraud, Oxium has incurred expenses and costs and foregone other distribution arrangements, the value of which also far exceeds the amount in controversy. Oxium also invested approximately one million dollars in machines and materials to produce its system and products to meet OXO's order forecasts.

28. OXO is subject to the personal jurisdiction of this Court. OXO deliberately and intentionally reached out to do business with Oxium in Florida, and negotiated an agreement with Oxium principals located in Florida. OXO also directed orders to Oxium in Florida and made payments for product and system to Oxium there. Oxium further manufactured the product and system in Florida that OXO purchased and incurred expenses in Florida to meet OXO's orders. OXO further held training events for its personnel on Oxium's product and system in Florida. *See* Fla. Stat. § 48.193(1)(a)(1).

29. OXO and OXO Barbados further committed fraud against Oxium in Florida and caused Oxium harm there. *See id.* § 48.193(1)(a)(2).

30. Venue is proper in this District pursuant to 28 U.S.C. §§ 89(b) & 1391(b)(2), because a substantial part of the events giving rise to Oxium's claims against OXO and OXO Barbados occurred in this District. Oxium also researches, develops, and manufactures the product and system at issue in this District, incurred expenses to meet OXO's orders in this District, and shipped certain products to OXO from this District.

31. Oxium also signed the purported agreement that OXO fraudulently induced Oxium to enter in this District.

## FACTUAL ALLEGATIONS

### *Oxium Researches, Develops, And Manufactures Water-Based Technologies*

32. Oxium is a leading designer and manufacturer of water-based technologies, including its cutting edge Microsys™ product and system. Microsys™ operates as a penetrating concrete restoration system that strengthens and extends the life of concrete structures.

33. Among other benefits, the Microsys™ product and system reduces the oxidation of reinforcement steel, adds compressive strength to concrete, and prevents long-term deterioration.

34. In addition to Microsys™, Oxium has developed numerous other products and systems, including its Firesys™ Fire Protection System for fire containment, Soliqua™ cleaning product, and Microglass™ System for swimming pool protection.

### *OXO Induces Oxium To Negotiate An Exclusive Distribution Agreement*

35. Recognizing the substantial value of Oxium's products and systems, OXO approached Oxium about entering a distribution agreement.

36. OXO is a Canadian corporation that purports to develop and implement projects designed to increase the strength and durability of concrete structures, but, in fact, has little expertise or experience doing so.

37. By combining Oxium's proprietary and coveted Mircosys™ product and system with its own operations and projects, OXO stood to benefit substantially from a distribution arrangement with Oxium.

38. In November 2020, OXO's Chief Executive Officer, Wesley Serra, entered negotiations with Oxium's principals for OXO to obtain exclusive worldwide distribution rights for Oxium's Microsys™ product and system.

39. During negotiations, and to induce Oxium into entering an agreement, OXO promised Oxium that it had secured numerous lucrative construction projects and government grants.

40. OXO prepared and distributed "pitch decks" to Oxium that touted its alleged business plan and extensive government contacts, customer base, and lobbying capabilities.

41. OXO further represented it had multiple outside investors waiting to invest tens of millions of dollars in the parties' distribution efforts – investments that were contingent on the parties entering an exclusive worldwide distribution agreement as soon as possible.

42. The parties held several meetings and conference calls to negotiate a possible agreement.

43. OXO representatives also traveled to Florida to assess Oxium's capabilities.

44. On nearly every call and at nearly every meeting, OXO relentlessly pressured Oxium to "get something in place" as soon as possible or it would lose millions of dollars in investments and growth opportunities that it promised were already lined up.

45. In December 2020, the parties exchanged multiple drafts of a proposed distribution agreement.

46. OXO continued to represent to Oxium that it secured contracts and grants and demanded that Oxium enter an agreement as soon as possible.

47. The parties ultimately finalized negotiations on a proposed agreement.

48. In January 2021, Oxium's principals signed a DocuSign page in Florida for a document saved as "Agreement Final Oxo Oxium 1a.pdf" ("Oxium Version").

49. In entering the Oxium Version of the agreement, Oxium relied on OXO's promises that it had lucrative contracts and grants, as well as substantial investments waiting in the wings, all of which would fall into place with an exclusive distribution arrangement.

50. Oxium further and reasonably believed OXO's promises were true and relied on them. Its promises of guaranteed growth, investment, and projects were material considerations that induced Oxium to enter the Oxium Version of the agreement.

51. Oxium would never have entered any distribution agreement – let alone an exclusive one – with OXO if it knew that its representations about contracts, grants, customers, and investors were false. Oxium's proprietary technology is highly valuable and marketable and there are many other potential distributors for it – distributors that, it turns out, are far more capable of successfully distributing Oxium's products than OXO.

52. On signing the agreement, Oxium also understood that it was signing the final version the parties negotiated (that is, the Oxium Version) under which OXO would obtain exclusive worldwide distribution rights only for the Microsys™ product and system in exchange for paying Oxium for the equipment and materials to produce it.

53. Under that agreement, Oxium was precluded from entering any other distribution arrangements for its Microsys™ product and system.

54. After Oxium executed the DocuSign page, Oxium transmitted the Oxium Version via e-mail to Serra, who acknowledged receipt of it.

55. OXO did not execute the agreement immediately, but promised it would do so. But Oxium has learned that it never did.

56. Instead, long after the parties supposedly struck a deal, OXO surreptitiously and without notice sent Oxium a counter-proposal with materially different terms. Thus, on January 6, 2021, OXO emailed Oxium a new document, saved us "2021-01-06 15.02.13 (1).pdf." ("OXO Version").

57. OXO did not disclose that it was making a counter-proposal or that the attached agreement contained materially different terms from the one Oxium agreed to – and had believed that OXO had too. Without explanation or disclosure, OXO just attached its new counter-proposal to an email discussing an unrelated topic.

58. Despite transmitting a new and different agreement to Oxium, on multiple occasions, Serra and OXO's counsel nevertheless acknowledged by email that the Oxium Version of the agreement governed the parties' distribution relationship. But, it turns out, OXO never accepted that version of the agreement, despite its false representations to the contrary.

59. OXO later purported to assign the parties' "agreement" to OXO Barbados as an "administrative" matter.

### *OXO Fraudulently Alters The Parties' Distribution Agreement*

60. Understanding that the parties had entered the Oxium Version of the agreement, Oxium undertook efforts to develop and prepare its Microsys™ product and system for distribution by OXO, including making substantial investments in machines and materials necessary to produce its system for distribution.

61. Given OXO's promises of substantial client orders and contracts, Oxium worked to have its product and system ready for distribution as soon as possible. To that end, it incurred substantial costs and expenses in Florida to expedite production of the Microsys™ product and system.

62. OXO also placed and paid for initial orders with Oxium for it to deliver its product and system from Florida for distribution.

63. In further reliance on OXO's promises, Oxium also spent millions of dollars acquiring specialized equipment and supplies, upgrading its production capabilities, and hiring additional staff to meet OXO's demand requirements.

64. OXO further had its personnel attend training events in Florida on preparing and using Oxium's product and system.

65. From January 2021 to December 2021, however, OXO barely placed any orders for Oxium's Microsys™ product and system.

66. The volume of orders was only a fraction of the amount Oxium expected based on OXO's promises of substantial contracts and grants.

67. Oxium promptly raised the issue of OXO's meager orders with it. But in response, OXO refused to provide any proof of its business operations and status of its ongoing projects.

68. And, as time went on, the substantial orders it touted *never* materialized. After one year of placing almost no orders, it became clear that OXO had in fact secured *zero* contracts or projects and did not receive any government grants – all of its representations were false.

69. OXO also had yet to disclose *any* outside investor funding for its distribution operations. Again, contrary to its false representations, there were none.

70. To be clear, every promise OXO made during the parties' negotiations turned out to be false. OXO falsely represented it had secured serious projects and contracts, would receive government grants, and had serious outside investors waiting to back its operations. When OXO made all of these statements, it knew or ought to have known they were false.

71. Oxium relied on OXO's false material representations in entering the Oxium Version of the agreement.

72. In December 2021, after Oxium uncovered OXO's false statements, OXO began asserting that it was the exclusive distributor for additional Oxium products, including Soliqua™.

73. OXO's claims came as a surprise and shock to Oxium given the parties specifically negotiated and limited any exclusive distribution rights to the Microsys™ product and system under the Oxium Version.

74. When Oxium sought to understand the basis for OXO's new claims, OXO asserted for the first time the Oxium Version was not the controlling agreement. OXO instead circulated an entirely new document that Oxium never agreed to or had even reviewed.

75. Oxium also learned that OXO never signed the Oxium Version that it had executed in January 2021. Instead, OXO argued Oxium was bound to the OXO Version that it had surreptitiously counter-proposed.

76. But the OXO Version had materially different terms that the parties never negotiated and to which Oxium never agreed – indeed, these terms were never even disclosed to Oxium.

77. Among other new and different terms, the OXO Version expanded the scope of the exclusivity arrangement to include other Oxium products and systems in addition to its Microsys™ product and system, and even Oxium's *future* concrete-related products under development.

78. The OXO Version also altered and severely limited Oxium's termination rights.

79. To carry off its bad faith and fraudulent effort to force Oxium to be bound to an agreement it never knew about, let alone negotiated, OXO secretly and fraudulently copied Oxium's executed DocuSign signature page and inserted it into the OXO Version of the agreement.

80. While OXO never executed or accepted the Oxium Version of the agreement, it had executed the OXO Version that it had secretly counter-proposed.

81. With its daring ruse, OXO thus sought to bind Oxium to an agreement far broader and more favorable to it than the one the parties actually negotiated. It effectively rejected the offer presented in the Oxium Version and presented a counteroffer under the OXO Version that it fraudulently claimed Oxium had accepted – which it did not even know about.

82. As soon as it became aware of OXO's conduct, Oxium notified OXO that its new agreement was fraudulent and that, because OXO never finalized and signed the actual agreement (but instead rejected that agreement and counter-proposed a different one), the parties had no contractual arrangement, and OXO thus held no exclusive distribution rights.

83. Nevertheless, in April 2022, OXO notified Oxium that it was in breach of its purported exclusivity obligations by allegedly selling its products to a third party – a claim that was made in bad faith and completely baseless.

84. Oxium disputed OXO's allegations and further asserted the parties had never actually entered any contract given that OXO did not sign onto (but instead rejected) the one the parties had negotiated and Oxium did not know about, let alone agree to, the OXO Version.

85. Oxium has tried informally to resolve this dispute, to no avail. Even though Oxium has exposed OXO's misconduct, OXO continues to allege that it holds exclusive worldwide

distribution rights over Oxium's products and systems and that Oxium has breached its rights. It has also improperly threatened to try and enforce its fraudulent agreement against Oxium.

## CAUSES OF ACTION

### COUNT I
### (Fraudulent Inducement/ Misrepresentation Against OXO)

86. Oxium re-alleges and incorporates by reference Paragraphs 1 through 85 of the Complaint as if fully set forth herein.

87. OXO intentionally and falsely represented during the parties' negotiations that it secured substantial contracts and projects and would receive government grants.

88. OXO further intentionally and falsely represented it had outside investors to support the parties' distribution efforts and that their investments were contingent on Oxium granting OXO exclusive worldwide distribution rights as soon as possible.

89. OXO knew or ought to have known that its representations were false when made.

90. OXO intentionally made its false representations to induce Oxium to grant OXO exclusive worldwide distribution rights to Oxium's cutting-edge and valuable products and systems for its own unlawful gain and deprive Oxium the opportunity to enter distribution agreements with other parties.

91. OXO's false representations were material facts that Oxium relied on in entering an exclusive distribution agreement.

92. Additionally, OXO intentionally and fraudulently sought to pass off and hold Oxium to the OXO Version that Oxium was not even aware of and never agreed to.

93. Oxium never agreed or assented to any modifications to the Oxium Version of the agreement or otherwise agreed to expand the scope of OXO's purported distribution rights.

94. OXO intentionally and fraudulently altered the agreement to increase the scope of its exclusive rights over Oxium's products for its own unlawful gain.

95. OXO's fraudulent representations and conduct have harmed Oxium. By entering a purported agreement with OXO in reliance on its false representations, Oxium complied with the exclusivity requirements identified under the Oxium Version.

96. In doing so, and acting in good faith, Oxium declined to pursue and negotiate other lucrative distribution arrangements to honor its supposed obligations under the Oxium Version.

97. As a result, Oxium has been deprived of substantial financial gains it would have otherwise obtained through alternative distribution deals.

98. Oxium further incurred substantial costs and expenses in developing and manufacturing the Microsys™ product and system in reliance on OXO's false representations of significant client contracts, investments, and orders.

99. Oxium is entitled to damages and declaratory relief, as well as all other remedies provided under applicable law, as set forth below in its Prayer for Relief.

## COUNT II
**(Declaratory Judgment Pursuant To 28 U.S.C. § 2201 Against All Defendants)**

100. Oxium re-alleges and incorporates by reference Paragraphs 1 through 85 of the Complaint as if fully set forth herein.

101. An actual and justiciable controversy exists as to whether the parties entered an exclusive worldwide distribution agreement.

102. Oxium alleges that it never agreed to the OXO Version of the agreement and that the alleged parties – Oxium, OXO, and/ or OXO Barbados – are not bound by any exclusivity arrangement whatsoever based on OXO's rejection of the agreement the parties negotiated, its surreptitious counter-proposal Oxium never knew about let alone agreed to, and OXO's other

fraudulent conduct, while OXO alleges the parties are bound by the OXO Version of the purported agreement and thus has exclusive worldwide distribution rights to Oxium's products.

103. Oxium further alleges the parties never entered a legally binding agreement because the Oxium Version constituted an offer that OXO rejected when it failed to execute the Oxium Version and sent Oxium the OXO Version, which contained materially different terms and constitutes a counteroffer that Oxium did not know about or accept.

104. Pursuant to 28 U.S.C. § 2201, a judicial determination of the respective rights of the parties concerning the purported exclusive worldwide distribution agreements is necessary and appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, Oxium prays for this Court to enter judgment against OXO and OXO Barbados, granting the following relief:

1. A declaration that:

   - OXO fraudulently and intentionally misrepresented to Oxium its business position regarding customer contracts, government grants, and future investments and fraudulently altered the parties' purported distribution agreement;

   - The parties have no agreement because OXO rejected the Oxium Version and Oxium did not know about or agree to the OXO Version; and

   - Oxium is not bound to any exclusive worldwide distribution agreement with OXO and/ or OXO Barbados.

2. Actual damages in an amount according to proof;

3. Costs of suit herein, as permitted by law;

4. Attorney's fees, as permitted by law;

5. Pre-judgment and post-judgment and other interest on all monetary damages, as permitted by law; and

6. Any and all such further relief that the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Oxium demands a trial by jury in this action on all issues so triable as of right.

Dated: June 17, 2022

By: /s/ Eric J. Partlow
Eric J. Partlow, Esq.
Florida Bar No. 556531
eric.partlow@arlaw.com
ann.jones@arlaw.com

Michael A. Kolcun, Esq.
Florida Bar No. 86043
michael.kolcun@arlaw.com
ann.jones@arlaw.com

Adams and Reese LLP
100 N. Tampa Street, Suite 4000
Tampa, FL  33602
Telephone:  813-402-2880
Facsimile:  813-402-2887

Paul Werner  (*pro hac vice* to be filed)
Imad Matini (*pro hac vice* to be filed)
Sheppard, Mullin, Richter & Hampton LLP
2099 Pennsylvania Avenue NW
Washington, D.C. 20006
Telephone: 202-747-1931
Facsimile: 202-747-3817
pwerner@sheppardmullin.com
imatini@sheppardmullin.com

*Attorneys for Plaintiff Oxium LLC*